IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOSEPH CONLEY,                  ) | |
|                         ) | |
|          Plaintiff,        ) | |
|                         ) | |
| vs.                            ) | Case No. 11−cv−13−MJR–SCW |
|                         ) | |
| KIM BIRCH, J. BROWN, J. DAYMON,   ) | |
| STANFORD, WEXFORD HEALTH       ) | |
| SOURCES, INC., CAROL S. FAULESS,   ) | |
| and PENNY GEORGE            ) | |
|                         ) | |
|         Defendants.      ) | |

## MEMORANDUM AND ORDER

**Williams, Magistrate Judge:**

Plaintiff filed this cause of action on January 7, 2011, alleging deliberate indifference to serious medical needs against various Defendants as a result a broken hand he suffered during an altercation. (Doc. 1). Dr. Kim Birch and Wexford Health Sources, Inc. filed a Motion for Summary Judgment on September 2, 2013. (Doc. 114). The remaining Defendants, who are all IDOC employees, also filed a Motion for Summary Judgment (Doc. 116) on September 2, 2013. Plaintiff filed his separate Responses to both Motions on October 17, 2013. (Docs. 124 and 125). Defendants filed their Replies to Plaintiff's Response on October 21, 2013, making this Motion ripe for disposition. (Doc. 127; Doc. 128). For the reasons below, the IDOC Defendants' Motion for Summary Judgment (Doc. 116) is **DENIED in part and GRANTED in part.** The Wexford Defendants' Motion for Summary Judgment is **GRANTED**.

### BACKGROUND

Pursuant to 42 U.S.C. § 1983, Joseph Conley, an inmate at Lawrence Correctional Center, sued multiple Defendants on the theory Defendants violated his Eighth Amendment rights by

showing deliberate indifference to his medical needs after he hurt his hand during an altercation with another prisoner at Vienna Correctional Center. (Doc. 1). The Court dismissed Plaintiff's claims against Michael Randle, the Illinois Department of Corrections, Officer John Doe 1, and John Cox on threshold review pursuant to § 1915A. (Doc. 12).

Plaintiff was involved in an altercation at Vienna on December 22, 2009. (Pl's Dep. p. 20). Plaintiff does not recall the time of day, the identity of his assailant, or the physical appearance of his assailant. (Pl.'s Dep. p. 21). The assailant swung a combination lock towards Plaintiff's head, which Plaintiff blocked with his right hand. (Pl.'s Dep. p. 23). When the lock came into contact with Plaintiff's hand, he heard a pop and felt excruciating pain. (Pl.'s Dep. p. 23). Approximately one hour later, Plaintiff sought out an unidentified guard that his hand was broken and that he needed to see a doctor. (Pl.'s Dep. p. 25). The guard told him that he would send Plaintiff down to healthcare, however, if healthcare determined that Plaintiff's condition was not an emergency, he would write Plaintiff up for lying. (Pl.'s Dep. p. 28). Plaintiff went back to his unit. (Pl.'s Dep. p. 28). At approximately 8 p.m. that same day, Plaintiff told Defendant Daymon that he needed medical attention while in the med line. (Pl.'s Dep. p. 28-29). Daymon told Plaintiff he needed to sign up for sick call, but Plaintiff told her he couldn't write due to his injured hand. (Pl.'s Dep. p. 32). Daymon took no further action. (Pl.'s Dep. p. 35).

The next day, Plaintiff again attempted to seek medical attention by informing Defendant Stanford that his hand needed medical attention while at the morning med line. (Pl.'s Dep. p. 33). Stanford told Plaintiff that she would call him back down from his dormitory to the health care unit when she was finished with the med line, but never did. (Pl.'s Dep. p. 33).

On December 23, 2009 at 8 p.m., Plaintiff once again attempted to get medical attention for his injured hand from Defendant Fauless, who again told Plaintiff that she would call him back down from his dormitory, but never did. (Pl.'s Dep. p. 24).

On December 24, 2009, Plaintiff asked Stanford for medical attention at the morning medication line. (Pl.'s Dep. p. 35). Plaintiff again repeated that he needed medical attention, and Stanford again told him that she would call him back down, but never did. (Pl.'s Dep. p. 35). Plaintiff testified that on the morning of December 24, his hand had swelled up "like a boxing glove," and that it was discolored. (Pl.'s Dep. p. 36). He believed that it was broken at this time because he could not move it. (Pl.'s Dep. p. 36). He showed his hand to Stanford. (Pl.'s Dep. p. 36). Plaintiff also testified that the nurse at the evening med call line, later identified as Fauless, denied him treatment for his hand as well. (Pl.'s Dep. pp. 39-40).

Med call line takes place in the health care unit itself, and inmates must arrive on the unit to get their medication. (Birch II Dep. p. 32). When an inmate requests medical attention during med line, they are asked to take a seat, and are assessed when the RN becomes available. (Potts Dep. p. 31). The policy was to have inmates in need of medical attention wait in the health care unit, not in their dormitory. (Sanford Dep. p. 47-49). An inmate might wait fifteen minutes to see a nurse in this scenario. (Potts. Dep. p. 32). Inmates routinely bring problems to the nurses' attention during med line. (Fauless Dep. p. 58). The guards permit the inmates to linger in the health care unit when the nurses have asked them to stay. (Fauless Dep. p. 59). The nurse has discretion about which complaints need to be seen, for example Defendant Daymon testified that if an inmate complained that his hand hurt, she would ask him to wait in the health care unit if the injury was swollen, but not if it was merely painful. (Daymon Dep. pp. 50-51). Normally, after inmates receive their medication, they gather in the lobby to wait for the guard to escort the unit as a whole back up to the dormitory. (Fauless Dep. p. 60). Fauless specifically testified that she would not send an inmate with an obvious problem away and tell him to come back later. (Fauless Dep. p. 64). If an inmate had been asked to wait, he would have to sign a refusal of care to leave the health care unit. (Daymon Dep. p. 67).

Plaintiff testified that after he was again denied medical care at the evening call line on December 24, 2009, he showed Lt. Felton his hand and Lt. Felton brought him to the health care unit. (Pl.'s Dep. pp. 39-40). Plaintiff later clarified that he got in another altercation at approximately 8:30 p.m., and that he received medical attention after the guards broke up that fight. (Pl.'s Dep. p. 56). Plaintiff testified that he did not use his injured hand in this fight and that his assailant punched him twice before the guards broke up the fight. (Pl.'s Dep. pp. 57-58). The disciplinary report described both inmates throwing punches and in particular described Plaintiff "swing[ing] from behind hitting Robinson in the side of the face." (Doc. 117-1, p. 182). Although Plaintiff testified that this fight occurred after med line, the disciplinary report indicates that it happened at approximately 6:00 p.m. (Doc. 117-1, p. 182). Plaintiff pled guilty at his adjustment committee hearing and testified that he hit inmate Robinson. (Doc. 117-1, p. 183). Plaintiff was sentenced to one month C grade and one month segregation, lost one month of good time credit, and scheduled to be transferred. (Pl.'s Dep. p. 55). Plaintiff testified the disciplinary report he received after the fight was false when it said he was seen throwing punches and that he only acted defensively, but that the guards put that in the report to make it easier to discipline him. (Pl.'s Dep. p. 104).

Nurse Potts examined Plaintiff's hand on December 24, 2009 and placed a call to Defendant Birch. (Pl.'s Dep. p. 46). Plaintiff did not hear this phone conversation. (Pl.'s Dep. p. 47). Nurse Potts gave Plaintiff an ice pack and ibuprofen. (Pl.'s Dep. p. 48). Nurse Potts noted pain, discoloration, limited motion, and swelling. (Doc. 115-2, p. 2). The medical records also indicate that Plaintiff reported that the injury stemmed from December 22, 2009. (Doc. 115-2, p.2). Potts would not necessarily document that an injury occurred prior to an inmate reporting it, as that was a common occurrence and not that relevant. (Potts Dep. pp. 28-29). Potts has no independent recollection of Plaintiff. (Potts Dep. p. 11). Potts testified that x-rays can be telephonically ordered.

(Potts Dep. p. 48). If an inmate had an obvious and severe break, the facility may refer them to Heartland Regional Medical Center for immediate treatment. (Potts Dep. p. 47).

Birch has no independent recollection of the Potts' phone call on December 24, 2009. (Birch Dep. p. 70). Her normal procedure would have been to review the case with the nurse over the telephone. (Birch Dep. p. 72). The nurse had guidelines to follow, and could suggest an x-ray to Birch. (Birch Dep. pp. 72-73). If the patient needed further evaluation, they would be put on the list to see the doctor as soon as there was an opening. (Birch Dep. p. 74). Ice, ibuprofen, and rest would have been appropriate treatment for a nurse to administer when confronted with a patient who had swelling and discoloration on his hand. (Birch Dep. p. 75). A nurse may recommend an x-ray if the patient had a gross deformity. (Birch Dep. p. 75). Plaintiff did not have a deformity, although his hand was swollen, discolored and had limited range of motion. (Doc. 115-2, p. 2). Whether or not to recommend an x-ray was a matter of judgment, because fights at Vienna occurred frequently. (Birch Dep. p. 74). A patient who presented with swelling would have a differential diagnosis of contusion or fracture. (Birch Dep. p. 77).

Although Birch took calls on Christmas day, she did not report to work. (Birch Dep. p. 83). She also recalls taking the day after Christmas off, but cannot say for certain that she took the period until December 29, 2009 off, although she concedes it is possible. (Birch Dep. p. 84). There would have been no physicians onsite during the days that she took off. (Birch Dep. p. 84).

Birch examined Plaintiff's on December 29, 2009 around 10:00 a.m. in the morning. (Pl.'s Dep. p. 50). Birch ordered x-rays to rule out a fracture and a follow-up visit in one week. (Pl.'s Dep. p. 50); (Doc. 115-2, p. 3); (Birch Dep. p. 88). Birch's notes also indicate the Plaintiff's hand had been more swollen and painful a few days prior and that he reported that "he can move it good now." (Doc. 115-2, p. 3); (Birch Dep. p. 87). Plaintiff believed he would receive an x-ray on the following day. (Pl.'s Dep. p. 53). While Birch was the only person who could order x-rays, she was

not familiar with the security procedures or concerns surrounding transport to the other facility. (Birch Dep. p. 90). Birch did not splint the hand or order an ace bandage because Plaintiff was in segregation at the time, and Birch believed that these treatments posed security risks. (Birch Dep. p. 127-28). Plaintiff's x-ray was scheduled for January 6, 2013.

Wexford Health Sources, Inc. provides x-rays to Vienna inmates by utilizing the Shawnee facility, and x-ray technicians subcontracted through Precise Specialties. (Doc. 115-5, p. 1). IDOC is responsible for determining the amount of annual hours devoted to x-rays. (Doc. 115-5, p. 1). It is also responsible for transporting inmates between facilities. (Doc. 115-5, p. 2). However, Cheri Laurent, Vice President of Operations for Wexford, specifically testified that the availability x-rays "is not based on the transport bus. It's based on the availability of the x-ray technician at Shawnee Correctional Center, so that's what would drive the day and time that the x-ray would be scheduled and the patient transported." (Laurent Dep. p. 43). Wexford does not defer to Precise Specialties' availability. (Laurent Dep. p. 46). Rather Wexford "insists" that they come on certain days, typically twice a week on Mondays and Thursdays, so that the x-ray availability is spread out during the week. (Laurent Dep. pp. 46-47); (Birch Dep. pp. 89-90). Laurent implied that the fact that it was a holiday week during the relevant time period may have impacted the x-ray technician's hours. (Laurent Dep. p. 43).

Brown had a conversation with Birch on January 5, 2010, in which they discussed cancelling Plaintiff's appointment scheduled for that day because Plaintiff's x-ray was scheduled for January 6, 2010, and Birch would rather see him after the x-ray. (Brown Dep. p. 56). Plaintiff testified that he understood that Birch wanted to see him after his x-ray. (Pl.'s Dep. p. 73). Birch had already planned to do segregation rounds on January 6, 2010, which would have included Plaintiff. (Brown Dep. p. 56). Brown cancelled the appointment scheduled for the 5th. (Brown Dep. p. 56).

On January 6, 2010 at approximately 8:30 a.m., Brown allegedly woke Plaintiff up in segregation and had him sign a form. (Pl.'s Dep. p.75). He did not explain the form. (Pl.'s Dep. p. 75). Plaintiff signed it without reading it. (Pl.'s Dep. p.75); (Doc. 115-2, p. 23). The form stated that Plaintiff refused treatment, specifically that he refused the scheduled x-ray. (Pl.'s Dep. p. 75) (Doc. 115-2, p. 5) (Doc. 115-2, p. 23). Brown allegedly did not tell Plaintiff that it was time for his x-ray or ask him to go get his x-ray, nor did he explain the consequences of refusing the x-ray. (Pl.'s Dep. p. 76). Brown, in contrast, testified that he specifically remembered having a conversation with Plaintiff in which Plaintiff refused the x-ray. (Brown Dep. p. 56). Brown believes that a guard would have had to fetch Plaintiff for his x-ray out of segregation, and that it is possible a guard told him that Plaintiff did not want to go, at which point Brown himself went to Plaintiff's cell. (Brown Dep. pp. 72-73). Brown resubmitted the paperwork ordering the x-ray on the same day that Plaintiff refused it. (Brown Dep. p. 57). Brown testified that he was not responsible for scheduling or cancelling Plaintiff's x-ray. (Brown Dep. p. 57).

Birch was not present when Plaintiff signed the form and did not discuss the risks of refusing treatment with Plaintiff at that time. (Pl.'s Dep. p. 148) (Birch Dep. pp. 103-104). Vienna policy allowed the nurses *and* the doctor to get refusals signed, but the form requires the name of the doctor to be printed on it. (Birch Dep. pp. 103-04). Birch testified that according to the policy, it was acceptable to have inmates sign refusals that stated that she herself had explained the risks when a nurse would have actually been the only medical staff present for the refusal. (Birch Dep. pp. 104-07). Birch assumed that pursuant to the policy, Brown explained the risks of refusing medical care to Plaintiff. (Birch Dep. pp. 113-14). If Plaintiff had stated that he had not refused the x-ray at the 10:00 a.m. visit, Birch would have noted that in his chart. (Birch II Dep. p. 30). The log maintained by Heidi Reynolds, former medical records director at Vienna, indicates that inmates were scheduled

to be taken to Shawnee for x-rays on December 29, 2009 and January 6, 2010, and that Plaintiff refused an x-ray on the 6th. (Reynolds Dep. pp. 39-40); (Doc. 115-6, pp. 4, 6).

Plaintiff saw Birch approximately 90 minutes later at 10:00 a.m., and asked her why he did not get his x-ray. (Pl.'s Dep. p. 77). Plaintiff was informed that he signed a refusal and the van taking inmates to Shawnee Correctional Center for x-rays had already left. (Pl.'s Dep. p. 77). Birch re-ordered the x-ray and renewed Plaintiff's pain medication. (Pl.'s Dep. p. 77); (Doc. 115-2, p. 5); (Birch Dep. p. 101). That was the last time Plaintiff saw Birch. (Pl.'s Dep. p. 81); (Birch Dep. p. 124). He then transferred to Big Muddy Correctional Center on January 13, 2010, where he received treatment for his hand. (Pl.'s Dep. pp. 81, 83). X-rays confirmed Plaintiff's hand was broken. (Pl.'s Dep. pp. 150) (Doc. 115-2, pp. 11-12).

Currently, Plaintiff suffers from a permanent extension lag. (Pl.'s Dep. p. 114). He suffers from constant pain and his hand is prone to swelling. (Pl.'s Dep. p. 114). His grip is not as strong as it was prior to the relevant time period. (Pl.'s Dep. p. 115). Dr. Bruce Schlafly testified that ideally, a person in Plaintiff's position would have had an x-ray in three to five days, and surgery within two weeks. (Schlafly Dep. pp. 14-15, 21). He also testified that it was possible that a patient whose bone was not set promptly could develop angulation of the fingers. (Schlafly Dep. p. 9).

## DISCUSSION

### a) *Summary Judgment Standard*

Summary judgment, which is governed by FEDERAL RULE OF PROCEDURE 56, is proper only if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. ***Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011) (citing FED. R. CIV. P. 56(a)).**[1] The party seeking

---

[1] Though Rule 56 was amended in 2010, the amendment did not change the summary judgment standard. ***Sow v. Fortville Police Dept.*, 636 F.3d 293, 300 (7th Cir. 2011).**

summary judgment bears the initial burden of demonstrating, based on the pleadings, affidavits and/or information obtained via discovery, the lack of any genuine issue of material fact. ***Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).** A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. ***Anderson*, 477 U.S. at 248**. If a party fails to properly address another party's assertion of fact, courts may "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it." **FED. R. CIV. P. 56(e).** A mere scintilla of evidence supporting the non-movant's position is insufficient; a party will successfully oppose summary judgment only when it presents definite, competent evidence to rebut the motion. ***Albiero v. City of Kankakee*, 246 F.3d 927, 931–32 (7th Cir. 2001). *See also Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) ("[S]ummary judgment is . . . the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events") (internal quotation marks omitted).** There is "no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." ***Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010); *accord Anderson*, 477 U.S. at 248 (material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party).**

At summary judgment, the Court's role is not to evaluate the weight of the evidence, to judge witness credibility, or to determine the truth of the matter, but rather to determine whether a genuine issue of triable fact exists. ***Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).**

### b) *Deliberate Indifference Standard*

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. ***Greeno v.***

*Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). ***Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution.")**. A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care. ***Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).**

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. ***Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011),** *citing Johnson v. Snyder*, **444 F.3d 579, 584 (7th Cir. 2006).** The first prong is whether the prisoner has shown he has an objectively serious medical need. ***Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653.** A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. ***Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the *Eighth Amendment* requires "deliberate indifference to a *substantial* risk of *serious* harm.") (internal quotation marks omitted) (emphasis added).** Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable. ***Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005).**

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. ***Greeno*, 414 F.3d at 653.** The plaintiff need not show the physician literally ignored his complaint, just that the physician was aware of the serious medical condition and either knowingly or recklessly disregarded it. ***Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).** Courts give deference to physicians' treatment decisions, since "there is not one proper way to practice medicine, but rather a range of

acceptable courses." *Jackson v. Kotter*, 541 F.3d 688, 697–98 (7th Cir. 2008). A doctor who chooses one routine medical procedure over another does not violate the Eighth Amendment. *McGowan v. Hulick*, 612 F.3d 636, 641 (7th Cir. 2010). *See also Estelle*, 429 U.S. at 107 (whether additional diagnostic techniques or treatments were needed was a "classic example of a matter for medical judgment."). Deliberate indifference may also be shown when a medical provider refuses to refer a patient to a specialist for treatment of a painful medical condition that clearly requires a referral. *See Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Snyder v. Hayes*, 546 F.3d 516, 526 (7th Cir. 2008).

### 1. Serious Medical Need

The parties do not appear to be disputing that a broken hand is a serious medical condition. (See Doc. 117, p. 13). Plaintiff has retained an expert that specifically testified that Plaintiff currently suffers from a loss of function that may have been caused by the delays in his care. Plaintiff has therefore submitted actual evidence that he suffers from a serious medical condition as a result of the delay in his care. *See Jackson v. Pollion*, --F.3d --, No. 12-2682, 2013 WL 5778991 at * 1 (7th Cir. 2013).

However, Defendants have disputed that Plaintiff suffered a serious injury on December 22, 2009. Instead, for the purposes of summary judgment, they argue that the relevant injury occurred on December 24, 2009. However, Plaintiff has submitted enough evidence to create a genuine issue of material fact on this point. Plaintiff testified at his deposition, under oath, that he broke his hand on December 22, 2009 when another inmate swung a padlock at his head. Plaintiff's story is also fully corroborated by the medical records of the prison. At the time Plaintiff received medical care, he also alleged that his hand was broken prior to the December 24, 2009 fight, and this allegation was documented by the nurses at the time of the incident. That is sufficient to survive

summary judgment, and the Court cannot state as a matter of law that Plaintiff's serious medical need only arose on December 24, 2009. The issue must go to the jury

### 2. Nurse Brown – deliberate indifference

.  In its threshold order, the Court found that Plaintiff had stated a claim against Brown because Brown cancelled the scheduled January 5, 2010 doctor visit with Birch. (Doc. 12, p. 10). Plaintiff did not mention the refusal form in his Complaint, nor did he attach the refusal form as an Exhibit to his Complaint along with the rest of his medical file. (Doc. 1). Its absence is conspicuous in light of the copious amounts of medical records actually submitted with the Complaint. Plaintiff also never sought leave to amend his complaint to add additional claims against Defendant Brown based his activities in getting the refusal of care form signed. A plaintiff cannot amend his complaint by raising new claims in his brief in opposition to a motion for summary judgment. *Grayson v. O'Neill*, **308 F.3d 808, 817 (7th Cir. 2002)**. For the purposes of assessing Brown's argument on summary judgment, the Court will only examine the cancellation of the January 5, 2010 doctor's appointment because Plaintiff does not have a viable claim against Brown for getting the refusal form signed in this case.

Brown's action in cancelling Plaintiff's doctor visit on January 5, 2010 was not deliberate indifference. Both Plaintiff and Brown testified that Birch wanted to evaluate Plaintiff after he had received his x-ray. At the time Brown cancelled the scheduled January 5, 2010 visit, he believed that Plaintiff was scheduled for an x-ray and a doctor's visit the following day. There is also no evidence that Birch would have provided any more treatment to Plaintiff on January 5, 2010 had she seen him because she needed the x-ray to make an informed determination about which steps to take. Delaying care for one day in order for more tests to be run is the type of medical treatment decision that is entitled to deference under Seventh Circuit case law. Brown is entitled to judgment in his favor.

### 3. Nurses Daymon, Fauless, and Stanford – Deliberate Indifference

Plaintiff also alleges that Nurses Daymon, Fauless, and Stanford were deliberately indifferent because they did not treat Plaintiff's hand when he showed it to them in the med call line. (Doc. 12). Specifically, that they did not provide pain medication or refer him to see a doctor. Plaintiff has submitted his sworn testimony that he presented his bruised and swollen hand to each of the above Defendants in turn, and that they all told him to return to his dormitory and that he would be called for medical treatment later. Defendants have all testified that Plaintiff's testimony describes their procedures incorrectly, and that it was the nurses' practice to have inmates with serious medical needs in the med line wait in the health care unit. They also testified that they have no independent recollection of Plaintiff. This conflicting testimony is sufficient to create a genuine issue of material fact on whether the Defendants knew that Plaintiff had an injured hand and consciously disregarded the injury. Therefore, as to these Defendants, the Motion for Summary Judgment is denied.

### 4. Health Care Unit Administrator Penny George – Deliberate Indifference

A brief procedural summary is in order before the Court turns to address the substantive claims against George. George is not mentioned in Plaintiff's Complaint. (Doc. 1). Additionally, as discussed above, the initial complaint did not contain any claims based on the refusal form. (Doc. 1). In the threshold order, the Court identified three John/Jane Doe Defendants. (Doc. 12). Specifically, as to John/Jane Doe #3, the Court found that Plaintiff stated a claim for deliberate indifference for failing to arrange an x-ray on December 30. (Doc. 12, p. 10). Plaintiff later identified Jane Doe #3 as "Penny George" and she was added to the docket accordingly. (Doc. 54). Other than his identification of the two Doe Defendants, Plaintiff never moved to amend his Complaint or add any new claims.

However, Plaintiff argues on Summary Judgment that George was deliberately indifferent in approving Wexford's practice of obtaining fraudulent refusals of treatment from inmates. This is

not a claim present in the original Complaint. The Complaint states a claim for failure to schedule an x-ray.[2] Heidi Reynolds testified that as medical records director of Vienna, she was responsible for scheduling x-rays. (Reynolds Dep. pp. 6-7). Plaintiff testified that he never met or spoke to George during the events at issue. (Pl.'s Dep. pp. 109-110). He also testified that he wrote to Wexford to get her name specifically because he believed that she was responsible for scheduling. (Pl.'s Dep. p. 110). There is no testimony that George was personally involved in scheduling x-rays. Liability can only lie against those personally involved in the claimed deprivation of a constitutional right. *See Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001); *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1991). The personal responsibility requirement is satisfied "if the official acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982). Here, Plaintiff has not submitted any evidence that George knew that Plaintiff had been referred for an x-ray or took any action to interfere with Plaintiff's scheduled x-ray. George is entitled to summary judgment.

### 5. Dr. Birch – Deliberate Indifference

Plaintiff alleges that he broke his hand on December 22, 2009. It appears undisputed that Birch was not aware of his broken hand until December 24, 2009 when Potts called her. During that call, Birch only ordered ibuprofen and ice. She did not order an x-ray, or make any arrangements for Plaintiff to be seen prior to her return from her Christmas holiday. However, this is not deliberate indifference. When Birch was made aware of Plaintiff's need for medical treatment, she authorized painkillers and ice. While this is a conservative course of treatment, it is an appropriate for someone complaining of pain and swelling. Plaintiff argues that Birch should have

---

[2] The Court's threshold order specifically stated on December 30. Plaintiff now appears to concede that the x-ray shuttle went to Shawnee on December 29 prior to Birch's examination. However, as pro-se filing, we construe the Complaint broadly, and will consider the general claim that George failed to schedule an x-ray.

ordered an x-ray over the phone. Yet Plaintiff's symptoms could have indicated either a contusion or a fracture. In the absence of any obvious dislocation or signs of circulation damage, there is no way that Birch could have distinguished between the two over the phone. When faced with a medical condition, Birch ordered conservative treatment and scheduled Plaintiff for a doctor's appointment. Plaintiff's condition was not so obvious to Birch or the nurse reporting to her at the time that the failure to immediately refer out rises to the level of deliberate indifference. While it is certainly unfortunate (and perhaps even negligent) that Plaintiff's next appointment was not for an additional five days, this does not rise to the level of deliberate indifference because Birch responded to Plaintiff's medical need with an appropriate course of treatment.

### 6. Wexford Health Sources- Deliberate Indifference

To establish a *Monell* claim against Wexford, Plaintiff must show that they deprived him of a constitutional right 1) pursuant to an express policy; 2) pursuant to a wide a widespread custom; or 3) via a deliberate act of a decision-maker with final policy-making authority. ***Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009)**. There is no respondeat superior liability under *Monell*, rather a plaintiff must state that the unconstitutional conduct occurred pursuant to policy or custom. ***Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012)**. To establish the necessary causal link between the challenged policy or custom, the plaintiff must show it was the driving force behind the constitutional violation. ***Fairley v. Andrews*, 430 F.Supp.2d 786, 805 (N.D. Ill. 2006)**.

Wexford claims that it is entitled to summary judgment because it does not set the total number of annual hours for x-ray services and it is not responsible for transporting inmates to Shawnee for x-ray services. Strangely, Plaintiff's Response to Wexford's Motion does not address this point at all, even though the threshold Order clearly states that this is the only claim against Wexford Health Sources. It appears to the Court that Wexford understates its responsibility for x-

rays. It is clear from the record that although IDOC set the total number of hours per year, that Wexford was responsible for the weekly x-ray schedule through its subcontractor Precision Specialists. There is also some evidence in the record that implies that the x-ray hours may have been cut during the holidays, although that evidence is weak and offers no insight into Wexford's motivations for taking that course of action. While it may be negligent to reduce the hours without providing proper coverage, Wexford was still providing x-rays services for inmates in need of them. There were available x-ray appointments during the relevant time frame, and Plaintiff was scheduled for one of them. Plaintiff signed a refusal form, but Wexford cannot be held liable for that, regardless of the circumstances. Therefore, the Court cannot say that the limited x-ray hours during the relevant time period constituted deliberate indifference. Wexford is entitled to summary judgment on this ground.

Plaintiff's arguments against Wexford on the basis of Birch's role as a policy-maker are misplaced. First, Birch has a dual role at Vienna in that she not only serves as medical director, but is also the facility's only treating physician. It is clear from the record that her interactions with Plaintiff were as a physician, not as a policy maker. Additionally, Plaintiff points to Birch's policy about the medical refusal form as a specific policy that Birch promulgated that harmed him. Plaintiff cannot state a claim based on this policy, because as discussed above, no such claim is contained in his Complaint.

Plaintiff also argues that Wexford is liable due to the policy and custom of misleading inmates in the med call line. However, there is no evidence in the record that this was an official policy or custom. In fact, each of the defendant nurses testified that it was their policy to ask inmates to wait in the healthcare unit until the end of med line when they could be seen for treatment. They also testified that if they asked an inmate to wait, they would require him to sign a refusal if he chose to leave. Plaintiff has testified that this procedure was not followed in his case,

but he has not submitted other evidence of inmates treated in a similar fashion in order to show that this was the custom of the med line. To show a non-explicit custom, a plaintiff must show that there is a "widespread practice that is . . . permanent and well settled." *Teesdale v. City of Chicago*, 690 F.3d 829, 834 (7th Cir. 2012). Additionally, proof of a single incident of unconstitutional activity is only sufficient to impose liability if the actor was a policy maker. *Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985). Here, none of the nurses involved is a policy maker and Plaintiff has submitted no evidence, not even his own testimony, that there were problems with other inmates in the med call line or at other times. Without corroboration through other incidents, Plaintiff has failed to state a claim for the alleged custom in the med call line. However, this analysis is once again beside the point, because Plaintiff's claims against Wexford, as stated in the threshold order, only lie for the scheduling of x-rays. As the Court has determined that the x-ray schedule did not show deliberate indifference, Wexford is entitled to judgment in their favor.

## CONCLUSION

For the foregoing reasons, summary judgment is **GRANTED** as to Defendants Brown and George, and the clerk of the Court is instructed to dismiss them as parties and enter judgment their favor at the close of this case. Therefore Doc. 116 is **GRANTED in part and DENIED in part**, and Defendants Daymon, Fauless, and Stanford remain in the case. Summary Judgment is **GRANTED** as to Defendants Birch and Wexford Health Sources, and judgment should be entered in their favor at the close of this case. (Doc. 114).

**IT IS SO ORDERED.**

**DATED: December 2, 2013**

/s/ *Stephen C. Williams*
Stephen C. Williams
**United States Magistrate Judge**